IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM K. CROSBY, INDEPENDENT MOVEMENT OF PARATRANSIT RIDERS FOR UNITY, VEHICLES, EQUALITY ("IMPRUVE"), AYO MAAT, PATRICIA BAXTER CAROLINE MURPHY, CECELIA JACKSON, HAROLD BELLAMY, STEVIE DICKENS, RICHARD A. JAMES, MARLENE LUCAS, TRONEEKO FRENCH, TYQUAN BAXTER, GENEVARENE BAXTER, VENZELMA COTTON, and DEBBIE PITTMAN, <br><br>    Plaintiffs, <br><br>v. <br><br>GOVERNOR "ROD" BLAGOJEVIC; REGIONAL TRANSPORTATION AUTHORITY, JIM REILLY, CHAIRMAN; CHICAGO TRANSIT AUTHORITY, RON HUBERMAN, CHAIRMAN; PACE SUBURBAN BUS, RICHARD KWASNESKI, CHAIRMAN; <br>    Defendants. | No.07 C 06235 <br><br>Judge Kocoras <br><br><br>Jury Demand |

## FIRST AMENDED COMPLAINT

Plaintiffs, by and through their undersigned counsel, sue Governor Rod Blagojevich, the Regional Transportation Authority ("RTA"), the Chicago Transit Authority ("CTA"), and PACE Suburban Bus ("PACE") and allege:

### INTRODUCTION

1.  This is a action for declaratory and injunctive relief, as well as such other relief as may be just, proper, and equitable, to remedy Defendants' continuing violations of the right of the Plaintiff's to basic and essential transportation services under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.,* Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("Rehabilitation Act"), the regulations promulgated under these statutes, and 42 U.S.C. § 1983.

2.  Defendant Rod Blagojevich is Governor of the State of Illinois who, by amendatory veto, committed mass transit agencies in the State to provide free public transit to seniors riding so-

called "fixed route" transit systems while denying that privilege to persons with disabilities who have to rely on complementary paratransit service.

3. Defendant RTA describes itself as "the funding and financial oversight agency for the public transit operators in the six-county region of northeastern Illinois." "The RTA oversees the budgets and capital programs of the Chicago Transit Authority (CTA), Metra commuter rail, and Pace suburban bus." "The RTA ensures that the region meets its statutory obligation to recover 50 percent of transit operating costs from fares or other income and distributes the portion of sales tax allocated to transit to the CTA, Metra and Pace." Source: http://www.rtachicago.com/support/english.asp#7, checked May 29, 2008.

4. Defendant CTA is a public entity that operates a fixed route system in the City of Chicago and certain contiguous suburbs through its bus and rail systems. Title II of the ADA requires mass transit agencies to provide complementary "paratransit services" to individuals with disabilities, who due to their disabilities cannot otherwise safely use fixed route mass transit. The ADA further requires agencies to provide paratransit service at "a level of service. . . which is comparable to the level of designated public transportation services provided to individuals without disabilities using such system." 42 U.S.C. § 12 143(a).

5. Prior to July 1st, 2006, the CTA provided complementary paratransit services, under its own auspices, to individuals with disabilities who are unable to use fixed route transportation systems and who are determined to be eligible, for some or all of their trips, for such services under the Americans with Disabilities Act of 1990 and its implementing regulations.

6. Defendant PACE Suburban Bus is a public entity that operates bus service primarily outside of CTA's service area in the six "collar" counties of northeast Illinois. PACE took over administration of complementary paratransit service in the area served by the CTA on or about July 1st, 2006, pursuant to Public Act 94-370. The law amended the RTA Act, assigning responsibility for funding, financial review and oversight for ADA Paratransit services in the RTA region to the RTA..

7. PACE provides services in the Chicago ADA district through fleets of vehicles, operated by contractors, which are dispatched to pick up registered users from any location within three-quarters of a mile of any fixed route rail or bus stop.

## **FARES**

8. Chicago ADA Paratransit riders purchase tickets in books of ten for $25, or they may pay cash. Chicago ADA Paratransit riders may also purchase monthly passes for unlimited rides.

9.      On February 1st, 2008, PACE doubled the cost of a Chicago ADA monthly pass from $75 per month to $150 per month; given that many paratransit riders, including many of the plaintiffs, live on SSI or other fixed income and below the poverty level, this represents an oppressive and financially-crippling burden.

10.     On information and belief, the 200% fare increase for the monthly pass was predicated on the provision of Public Act 94-370 that requires:  "(ii) that the level of fares charged for ADA paratransit services is sufficient to cause the aggregate of all projected revenues from such fares charged and received in each fiscal year to equal at least 10% of the aggregate costs of providing such ADA paratransit services in fiscal years 2007 and 2008 and at least 12% of the aggregate costs of providing such ADA paratransit services in fiscal years 2009 and thereafter; for purposes of this Act, the percentages in this subsection (b)(ii) shall be referred to as the "system generated ADA Paratransit services revenue recovery ratio".

11.     As such, the "system generated ADA Paratransit services revenue recovery ratio" circumvents and violates the ADA and Rehabilitation Act, as it results in an insurmountable economic barrier to Chicago ADA Paratransit patrons and is not economically comparable to fixed route CTA monthly pass-holders. It is tantamount to eliminating the monthly pass for the vast majority of those paratransit-eligible persons.

12.     On information and belief, sales of Chicago ADA monthly passes plummeted from over 700 to less than 130 as a result of the 200% increase; thus, the fare increase is an insurmountable economic obstacle for over 80% of those former pass-holders.

13.     While Chicago ADA monthly passes doubled in price, CTA promoted and continues to promote sales of electronically-debited "pay as you go" passes and unlimited 30 day or monthly passes on its fixed route services for $75 per month, offering automated pre-authorized monthly debit service, discounted fares, and replacement of lost passes.

14.     The CTA's "Chicago Card" and "Chicago Card Plus" offer lower fares, quicker boarding, protected fares and a bonus reward. Chicago Card and Chicago Card Plus customers who "pay as you go" get a $2.00 bonus for each $20 of value added.  Card holders, whether "pay as you go" or monthly,  receive $.25 transfers on the fixed route system whereas cash customers may not receive transfers.

15.     Therefore, CTA provides strong economic and convenience incentives to non-disabled individuals to purchase unlimited monthly or electronically-debited passes, while persons with disabilities are financially discouraged and dis-incented from purchasing monthly paratransit passes in the same service area, i.e., the City of Chicago and contiguous suburbs.

Source:  http://www.transitchicago.com/maps/fares.html

16.      Persons with disabilities able to access and ride CTA fixed route may obtain Reduced Fare monthly passes for $35 per month.

17.     On March 17th, 2008, the "Seniors Ride Free" program was instituted by mass transit agencies throughout the State of Illinois, including the Defendants. In January, 2008 Illinois lawmakers approved and Governor Rod Blagojevich signed into law, through an amendatory veto process, House Bill 656 that provided new annual operating funds to northeastern Illinois' transit system.

18.     The new law provides free rides on fixed routes to seniors aged 65 and older living in the RTA's service region of Cook, DuPage, Kane, Lake, McHenry, and Will counties on the Chicago Transit Authority (CTA), Metra and Pace.

## SERVICE

19.     Many individuals with disabilities, including the individual plaintiffs, must depend on paratransit to conduct crucial aspects of their daily lives. In some cases they must rely on paratransit to travel to and from their places of employment. Others participate in volunteer activities. Some of these plaintiffs have a standing "subscription" reservation for a vehicle to pick them up on a regular schedule for their recurring trips to work and back. If they cannot rely on paratransit, they risk being unable to work and being deprived of their livelihood and of the personal rewards from being productive members of society.

20.     In other cases, plaintiffs must depend on paratransit to travel to and from medical appointments, such as dialysis treatments, physical therapy and physician examinations. All users depend on paratransit for important personal appointments and civic, educational, and religious activities much as individuals without disabilities rely on their personal automobiles, commuter rail, bus, other transportation facilities and even walking to conduct their personal affairs.

21.     Despite the crucial role paratransit necessarily plays in the lives of its users, PACE fails to provide even minimally adequate service and is materially inferior to the CTA rail and bus public transportation available to people without disabilities. A substantial portion of rides are late, often very late. Some rides arrive unreasonably early and leave before the scheduled arrival time. Some rides do not appear at all. Some rides are so extended and circuitous (often because the drivers are picking up and dropping off users at widely separated locations) that they last much longer than a reasonably direct trip would. During these trips, riders are denied access to food and water, medicine, and bathroom facilities. PACE's inadequate performance poses a threat to the health of many of its users.

22.     The impact of PACE's inadequate service on the lives of its riders is profound. In order to be able to adhere to their schedules or make appointments, riders must schedule rides for several hours before the time they would select if the service were reliable. They must appear at the pickup location well before the scheduled time to guard against a vehicle appearing too early and leaving. Thus, even if a particular ride is on time, PACE users must waste a significant amount of time each day attempting to be on time for important obligations. The unreliability of the PACE paratransit service causes serious disruptions to their schedules and erodes the quality of their lives.

23. In 1990, Congress enacted the ADA to address pervasive discrimination against persons with disabilities, including discrimination in the critical area of public transportation. Congress stated that the purpose of the ADA is to provide: "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

24. Title II of the ADA prohibits discrimination by public entities on the basis of disability, and specifically provides that no qualified individual with a disability shall be excluded from participation in or denied the benefits of the services, programs or activities of such public entity. 42 U.S.C. § 12131, *et seq.* Federal regulations also protect individuals with a disability from discrimination by a public entity "in connection with the provision of transportation service." 49 C.F.R. § 37.5(a).

25. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (*"Section 504"*), and its implementing regulations prohibit recipients of federal funding from discriminating against people with disabilities. Section 504 provides, in pertinent part: "[n}o otherwise qualified individual with a disability.. . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

26. Recognizing that the lack of access to reliable transportation is a significant barrier encountered by persons with disabilities, 42 U.S.C. § 12101(a), the ADA expressly requires state and public entities that provide public transportation services (known as "fixed route" services) also to provide complementary "paratransit services" to individuals with disabilities, like the plaintiffs, who by virtue of their disabilities cannot otherwise use the public transportation system. 42 U.S.C. § 12143. The U.S. Department of Transportation's regulations established pursuant to the ADA set forth the specific requirements for paratransit services. 49 C.F.R. §37.121, *et seq.* Federal regulation also requires a public entity to ensure that any contractor that provides services on its behalf complies with the ADA. 49 C.F.R. § 37.23(a).

27. PACE paratransit customers are required to telephone to schedule a ride at least one day in advance of their travel date and must meet the vehicle outside at a curb at a specified pickup location. PACE paratransit is a shared ride service. PACE's customers pay $2.50 per ride, regardless of the distance.

28. The plaintiffs are individuals within the City of Chicago and contiguous suburbs who need reliable and accessible public transportation to travel to work, medical appointments, religious services, and other critical life activities. Because of the nature of their disabilities and the inaccessibility to them of the general "fixed-route" public transportation system, these plaintiffs must rely on PACE paratransit as their primary means of transportation.

29. PACE paratransit is materially inferior to the public transportation available to people without disabilities. By failing to provide the plaintiffs with a paratransit system that complies with federal law, defendants have unlawfully discriminated against plaintiffs, unlawfully excluded them from equal participation in public transportation services, and unlawfully denied

them equal access to public transportation services, The plaintiffs are therefore entitled to declaratory, injunctive and equitable relief.

## INFRASTRUCTURE

30.　As mentioned supra, the ADA was passed in 1990; as such, the CTA and related entities have been on notice for the past eighteen years of their obligation under federal law to make the transit system accessible to persons with disabilities; despite that clear notice and the passage of almost two decades, the CTA remains inaccessible at many points throughout its fixed route rail and bus system.

31.　Additionally, even at points where the CTA system is arguably accessible to some persons with disabilities, the provisions for persons with disabilities are of inadequate capacity and not calculated to integrate significant numbers of persons with disabilities into the mainstream. In fact, if all persons with disabilities attempted to use fixed route transit, the CTA system would grind to a halt.

32.　While, eighteen years after the passage of the ADA, a large number of CTA rail stations still do not have elevators, even those with elevators require attendants to manually drag ramps out to load persons in wheelchairs into railcars, and significantly delay service as a result; additionally, elevators are frequently out of service with no prior notice provided to riders.

33.　While the CTA touts that 100% of its bus fleet has lifts for wheelchairs, if patrons cannot get to bus stops because they are inaccessible and lack nearby curb-cuts to accommodate patrons with disabilities, the presence of lifts on the buses is meaningless.

## JURISDICTION AND VENUE

34.　This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law.

35.　This Court has jurisdiction over plaintiffs' request for declaratory judgment pursuant to 28 U.S.C. §~ 2201 and 2202.

36.　Venue of this action properly lies in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a)(l)-(2) because many of the events and omissions giving rise to Plaintiffs' claims are occurring in this district.

## PARTIES

37.　Plaintiff Independent Movement of Paratransit Riders for Unity, Vehicles, and Equality ("IMPRUVE") is a non-profit membership organization that works on behalf of people with disabilities in the Chicago metropolitan area to ensure that civil rights laws important to people with disabilities are enforced.

38.     Plaintiffs are persons with disabilities residing in the Chicago ADA Paratransit area. Most, but not all of the plaintiffs are members of IMPRUVE. All plaintiffs depend on Paratransit for essential services such as medical appointments, shopping, religious services, community activities, family gatherings, legal and civic proceedings, and educational and employment opportunities. All of the plaintiffs have been eligible for paratransit services from PACE at all times relevant to this Complaint. Although each individual's situation is unique, it is a fair statement to say that their impediments are more severe than individuals riding fixed route transit.

39.     On information and belief, the plaintiffs represent perhaps one of the most physically, economically, and politically disadvantaged groups imaginable; it has been estimated that, among the Chicago ADA paratransit patrons:
- 80% are African-American
- 77% have no household vehicle
- 81% have annual income below $20,000; 69% below $15,000; 47% below $10,000; 16% below $5,000.
- 58% are 65 and older. (2004 CTA figures).

## CLAIMS

### First Claim For Relief

(Equal Protection, ADA, and Rehabilitation Act – All defendants)

40.     Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs, and further allege:

41.     By providing free mass transit service to individuals 65 years of age and older, while denying that service to persons with disabilities 65 years of age and older, defendant Governor Blagojevich and RTA, CTA, and PACE have denied persons with disabilities, including certain plaintiffs, the equal protection of the laws of the State of Illinois, and violated the ADA and Rehabilitation Act, as well as 42 U.S.C. §1983.

### Second Claim For Relief

(Violations of the Americans with Disabilities Act – RTA, CTA, and PACE)

42.     Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs, and further allege:

43.     At all relevant times, plaintiffs are and have been "qualified individuals with a disability" within the protection of Title II of the ADA, 42 U.S.C. § 12131.

44.     Defendants RTA, CTA, and PACE have discriminated against the plaintiffs in violation

of Title II of the ADA, 42 U.S.C. 12 143(a), by erecting insurmountable economic barriers to plaintiffs' use of complementary paratransit by, *inter alia*, setting the monthly pass fare at $150.

45. Defendants RTA, CTA, and PACE have discriminated against the plaintiffs in violation of Title II of the ADA, 42 U.S.C. 12 143(a), by failing to provide transportation services to individuals with disabilities, including individuals who are mobility impaired, that are sufficient to provide these individuals a level of service that is comparable to the level of designated public transportation services provided to individuals without disabilities.

46. Defendants are "public entities" under Title II of the ADA. RTA, CTA, and PACE are programs or activities of a public entity.

47. Defendants have unlawfully failed to meet required service criteria for their complementary paratransit system. 49 C.F.R. § 37.13 1. Specifically, defendants have permitted an operational pattern and practice that significantly limits service to ADA paratransit-eligible persons. 49 C.F.R. § 37.131(0(3).

48. Defendants have engaged in a continuing and pervasive pattern and practice that have caused substantial numbers of untimely pickups for initial and return trips and substantial numbers of trip denials or missed trips. 49 C.F.R. § 37.131(0(3). These violations of the ADA and its implementing regulations are also evidenced by: unreasonably lengthy and circuitous trips; a significant number of driver "no-shows" resulting in missed trips; discourteous telephone reservation service; inadequate telephone coverage and connections, including failure to answer the telephone, placing callers on hold for excessively long periods, and dropped calls; failing to provide accurate information about the location of assigned vehicles; failing to respond to complaints and requests for information; dangerous driving; discourteous drivers insensitive to the needs of disabled riders; recording a large number of "false no-shows"; flawed implementation and enforcement of the "No-Show/Late Cancellation Policy"; failing to announce the arrival of the vehicle to visually-impaired riders; creating health hazards caused by exposure to the elements due to late pickups and erroneous ride status information; failing to adequately train drivers regarding the need and method for restraining wheelchairs and scooters inside paratransit vehicles; failing to equip vehicles with adequate heat and air conditioning systems, scooter restraints, and operational wheelchair lifts; and other operational problems within the control of RTA, CTA, and PACE.

49. Defendants have denied plaintiffs equal participation in its transportation system because of their disabilities, denied plaintiffs the benefits of the services, programs, and activities of RTA, CTA, and PACE because of their disabilities, and discriminated against plaintiffs because of their disabilities.

50. Defendants' failure to provide plaintiffs with equal, meaningful access to the benefits of the facilities, programs, services, and activities of RTA, CTA, and PACE violates the ADA, 42 U.S.C. § 12131, *et seq.,* and its implementing regulations, 49 C.F.R. Part 37.

51. Defendants' acts and omissions constitute ongoing and continuous violations of Title II of the ADA, and, unless restrained and enjoined from doing so, defendants will continue to

violate Title II. Defendants' acts and omissions, unless enjoined, will continue to inflict an immediate threat of irreparable injuries for which plaintiffs have no adequate remedy at law.

52.     In engaging in the conduct described above, Defendants have either intentionally discriminated against plaintiffs or been deliberately indifferent to the strong likelihood that the pursuit of its policies would result in violations of federally protected rights.

### Third Claim For Relief

(Violations of the Rehabilitation Act - RTA, CTA, and PACE)

53.     Plaintiffs reallege and incorporate by reference all facts set forth in the previous paragraphs and further allege:

54.     Plaintiffs are "qualified individual[s] with a disability" under Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794. They are also "handicapped person[s]" within the meaning of 49 C.F.R. § 27.5.

55.     Defendants RTA, CTA, and PACE operate "program[s] or activity receiving Federal financial assistance" under Section 504 of the Rehabilitation Act.

56.     Defendants have denied plaintiffs equal participation in their transportation services and made their participation unduly burdensome solely by reason of plaintiffs' disabilities in violation of section 504 of the Rehabilitation Act of 1973 and its implementing regulations. 49 C.F.R. Part 27.

57.     Defendants have denied plaintiffs the benefits of the service, programs, and activities of its transportation services.

58.     Defendants have subjected plaintiffs to discrimination solely by reason of their disabilities.

59.     These violations of Section 504 by defendants establish a claim for declaratory and injunctive relief and compensatory damages against defendant pursuant to Section 505 of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2).

60.     In engaging in the conduct described above, defendants have either intentionally discriminated against plaintiffs or been deliberately indifferent to the strong likelihood that the pursuit of its policies would result in violations of federally protected rights.

### Fourth Claim For Relief

(Violations of the 42 U.S.C. § 1983 -Civil Rights Act-All Defendants)

61.     Plaintiffs reallege and incorporate by reference all facts set forth in the previous

paragraphs, and further allege:

62.     Defendants' violations of 42 U.S.C. § 12132, *et seq,* and Section 504 of the Rehabilitation Act, as set forth in plaintiffs' first, second and third claims for relief, establish a cause of action under 42 U.S.C. § 1983 for declaratory and injunctive relief and compensatory damages against defendants. Specifically, the defendants, acting under color of state law, have violated the rights of the plaintiffs under the ADA, Section 504 of the Rehabilitation Act, and the Equal Protection clause of the Fourteenth Amendment.

63.     In engaging in the conduct described above, defendants have either intentionally discriminated against plaintiffs or been deliberately indifferent to the strong likelihood that the pursuit of its policies would result in violations of federally protected rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

(a)     For a declaratory judgment declaring that defendants' actions, omissions, policies, and practices violate rights guaranteed to the plaintiffs under the ADA, Rehabilitation Act, and the federal constitution;

(b)     For an injunction requiring defendants to provide free rides for seniors 65 and over on Chicago ADA complementary paratransit, retroactive to March 17th, 2008.

(c)     For an injunction restoring the Chicago ADA monthly pass to $75, retroactive to February 1st, 2008.

(d)     For a permanent injunction on behalf of the plaintiffs ordering defendants to immediately cease their discrimination and provide individuals with disabilities full, equal and reliable access to the benefits of its facilities, programs, services, and activities;

(e)     For an injunction on behalf of the plaintiffs ordering the defendants to develop and implement a remedial plan, complying with the requirements of the ADA and Rehabilitation Act, and subject to approval by this Court, ending the unlawful policies, practices, acts, and omissions complained of herein, and to submit this plan to the Court and to the attorneys for plaintiffs' counsel for their review and approval;

(f)     For the Court to retain jurisdiction during implementation of the plan;

(g)     For compensatory damages to plaintiffs;

(h)      For plaintiffs' attorneys fees and costs of this proceeding, pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794(a), and 42 U.S.C. § 12133; and

(i)     For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues triable of right by a jury, pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted,


/s/Christopher Kruger
THE LAW OFFICES OF CHRISTOPHER KRUGER
2022 Dodge Avenue
Evanston, IL 60201
Phone: (847) 420 1763
Fax: (847) 733 9537
ARDC # 6281923